FILED

2018 NOV 14  PM 4: 24

U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____
DEPUTY

JUDGE FRANK MONTALVO

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| STATE OF TEXAS, ex rel PAULINE MOTTS, § | |
| § | |
| Relator, § | |
| § | No. |
| v. § | **EP18CV0348** |
| § | |
| EAST EL PASO PHYSICIAN'S MEDICAL § | |
| CENTER, LLC, D/B/A FOUNDATION § | |
| SURGICAL HOSPITAL OF EL PASO, § | |
| DON BURRIS, VOX INTUS, LLC, DESERT § | |
| IMAGING SERVICES, L.P, IN TANDEM § | |
| SOLUTIONS GROUP, LLC, PRINCIPLE HS § | |
| MANAGEMENT, LLC, D/B/A PRINCIPLE § | |
| HEALTH SYSTEMS, AMERICAN § | |
| INSTITUTE OF TOXICOLOGY, INC, § | |
| CONCORD LIFE SCIENCES, LLC, AND § | |
| NORTH CENTRAL FLORIDA § | |
| NEURODIAGNOSTIC SERVICES, LLC, § | |
| § | |
| Defendants. § | |

## RELATOR'S ORIGINAL COMPLAINT

Relator Pauline Motts, on behalf of the United States of America and the State of Texas, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729-3733 ("FCA") and the Texas Human Resources Code § 32.039 *et seq.* (the "TFCA") files this Complaint against East El Paso Physician's Medical Center, LLC, *et al.* This Complaint is premised on Defendants' knowing submission of false or fraudulent claims for payment to Federal and state government healthcare payers for medical services performed at facilities which did not meet the regulatory requirements for hospital outpatient diagnostic facilities or reference laboratories. In support thereof, Relator alleges as follows:

1

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and pursuant to 31 U.S.C. § 3729, *et seq.*, and 31 U.S.C. § 3730(b).

2.  This Court also has supplemental jurisdiction over Relator's claims arising under the laws of the State of Texas pursuant to 28 U.S.C § 1367(a) and 31 U.S.C. § 3732(b).

3.  Venue is proper in the Western District of Texas, pursuant to 28 U.S.C. § 1391(a) and 31 U.S.C. § 3732(a).  This case is based on the knowledge of Relator Pauline Motts, an "original source" as those terms are defined in 31 U.S.C. § 3730.

4.  This Complaint has been filed under seal and shall remain under seal for at least sixty (60) days and until the Court so orders.

5.  A copy of this Complaint has been served on the United States Attorney General and the United States Attorney for the Western District of Texas.

6.  All conditions precedent required by 31 U.S.C. § 3730 have occurred.

## PARTIES

7.  Plaintiff, the United States of America, acting through the Department of Health and Human Services ("DHHS"), administers the Health Insurance Program for the Aged and Disabled, established by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare").

8.  Plaintiff, the State of Texas, brings this action under the Texas Human Resources Code § 32.039 *et seq.*  The Medicaid program is a joint Federal-state program that pays certain healthcare costs for persons who are qualified to receive covered benefits as a result of their economic situation.  The Federal government reimburses States for a percentage of the payments made by States under their Medicaid programs.

9. Relator Pauline Motts ("Relator") is an individual and a resident of Texas who is employed as the Chief Financial Officer for Defendant, East El Paso Physician's Medical Center (d/b/a Foundation Surgical Hospital of El Paso).

10. Defendant East El Paso Physician's Medical Center, d/b/a Foundation Surgical Hospital of El Paso ("Foundation"), is a physician-owned facility with a staff of over 312 physicians. It is located at 1416 George Dieter Drive, El Paso, Texas, 79936. Foundation advertises that it provides services for 24-hour emergencies, gastroenterology, physical therapy, imaging, diagnostic radiology, and respiratory illnesses. Defendant Foundation may be served with process via its registered agent for service, J. Scott Mann, Kemp Smith LLP, 221 N. Kansas St., Suite 1700, El Paso, Texas 79901.

11. Defendant Don Burris is an individual who is employed as the Chief Executive Officer for Foundation. Burris may be served with process at Foundation's principal office at 1416 George Dieter Dr., El Paso, Texas 79936.

12. Defendant Vox Intus, LLC ("Vox Intus") is a foreign for-profit company based in Colorado. Defendant Vox Intus provides management services for Foundation and may be served with process via its registered agent for service of process, United States Corporation Agents, Inc. at 121 S. Tejon Street, Suite 900, Colorado Springs, Colorado 80903.

13. Defendant Desert Imaging L.P. ("Desert Imaging") operates a network of four (4) imaging centers in El Paso, Texas. Defendant Desert Imaging may be served with process via its registered agent for service, Leroy Candelaria of 118 W. Castellano, El Paso, Texas, 79912.

14. Defendant In Tandem Solutions Group, LLC ("In Tandem") provides billing services for entities engaged in the healthcare industry. Defendant In Tandem may be served with process

via its registered agent for service, Raul Jaime Arizepe, and he can be served with process at 122 W Catellano Drive, El Paso, Texas, 79912.

15. Defendant Principle HS Management, LLC, d/b/a Principle Health Systems ("Principle"), offers laboratory testing and management services to hospitals.  Defendant Principle may be served with process via its registered agent for service, James M. Dieter, and he can be served with process at 3917 Pebble Brook Drive, League City, Texas, 77573.

16. Defendant American Institute of Toxicology, Inc., d/b/a AIT Laboratories ("AIT"), is a foreign for-profit corporation, based in Indiana.  AIT provides laboratory testing services for hospitals. Upon information and belief, AIT merged with HealthTrackRx, a Texas corporation, in 2016.  HealthTrackRx is owned by Ancor Capital Partners.  Defendant AIT may be served with process via its registered agent for service of process, Cogency Global, Inc. of 1601 Elm Street, Suite 4360, Dallas, Texas, 75201.

17. Defendant Concord Life Science, LLC, d/b/a Concord Sciences ("Concord"), provides reference lab services to hospitals. Defendant Concord may be served with process via its registered agent for service of process, Christopher Light of 5823 Petty Street, Houston, Texas, 77007.

18. Defendant North Central Florida Neurodiagnostic Services, LLC, d/b/a NCF Diagnostics & DNA Technologies ("NCF"), is a foreign for-profit company based in Florida.  NCF provides laboratory testing services for healthcare providers.  Defendant NCF may be served with process via its registered agent for service of process, Adrian F. Harper, Sr., and he can be served with process at 12076 Technology Avenue, BLDG. EMILIV 1, Alachua, Florida, 32615-9498.

## THE LAW

19. With respect to federal healthcare programs, the False Claims Act (31 U.S.C. § 3729-3733) (hereinafter "FCA") prohibits any person from (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment; (2) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and (3) conspiring with others to commit a violation of the FCA.

20. The federal Anti-Kickback Statute, § 1320a-7b (hereinafter "AKS"), prohibits payment, receipt, offering, or solicitation of remuneration in exchange for the referral of services or items reimbursed by the Medicare or Medicaid programs. Requests for reimbursement of any such tainted claims are false claims and actionable under the FCA.

21. Providers that seek to bill Medicare must complete a Medicare enrollment application (form CMS-8550) and sign a Certification Statement. Under penalty of perjury, the provider certifies that he will "abide by the Medicare laws, regulation and program instructions that apply to [me] . . . . I understand that payment of a claim by Medicare is conditioned upon the claims and underlying transaction complying with such laws, regulations, and program instructions including, but not limited to Federal anti-kickback statute . . . and to the provider's compliance with all applicable conditions of participation in Medicare."

22. Relator brings this *qui tam* action to challenge Defendants' scheme to defraud Medicare and Medicaid by submitting claims for payment for medical services performed at facilities which did not meet the regulatory requirements for hospital outpatient diagnostic facilities or reference laboratories.

23. "Provider-based" status is a Medicare designation that allows hospitals to treat certain on and off campus departments, located outside of the hospital, as part of the hospital for billing

5

purposes. Services furnished in a location meeting provider based requirements are covered by Medicare as hospital outpatient services.

24. 42 C.F.S. 413.65 provides the requirements for the determination that facility department or facility has provider-based status.

25. As a threshold, pursuant to 42 C.F.S. 413.65(e)(1)(i), any outpatient facility must be 100% owned by the hospital seeking provider-based status.

26. 42 C.F.S. 413.65(b)(3)(ii) explains the requirements for any facility not located on the same "campus" as the main provider. This section permits any such facility to submit an attestation stating that it meets the criteria provided in 413.65(b)-(h).

27. Specifically, any facility (whether on-campus or otherwise) seeking provided-based status under the main provider must meet all of the following requirements:

    i.    § 413.65(d)(1): Remote location and main provider must operate under the same license;

    ii.    § 413.65(d)(2): Requires clinical services be integrated as follows:

        a.  Professional staff has privileges with main provider;

        b.  The main provider maintains monitoring and oversight of facility;

        c.  Facility seeking provider-based status maintains a reporting relationship with the Chief Medical Officer of the main provider;

        d.  Main provider is responsible for medical activities at the facility seeking provided-based status;

        e.  Medical records between both the main provider and facility are integrated; and

    f.  Inpatient and outpatient services of both the main provider and facility are integrated.

iii.  § 413.65(d)(3): Requires financial integration between the main provider and the facility seeking provider-based status;

iv.  § 413.65(d)(4): Requires public awareness that the main provider and facility seeking provided-based status are one in the same; and

v.  § 413.65(d)(5): Provides the obligations for any outpatient departments.

28. Additionally, an "off-campus" facility seeking provider-based status must also meet §413.65(e), which provides specific requirements as to operation and control, administration and supervision, and location.

29. Likewise, the same provider-based requirements apply to Medicaid payments. The Fifth Circuit has previously stated, "the regulations require that, in order to be considered hospital based, a clinic must have common licensure with the parent facility; provide services that are fully integrated with the hospital's services; share income and expenses with the hospital; hold out to the public that it is part of the hospital; and demonstrate it is under the control and ownership of the hospital." *La. Dep't of Health & Hosps. v. Ctr. for Medicare & Medicaid Servs.*, 346 F.3d 571, 572 (5th Cir. 2003) (citing 42 C.F.R. § 413.65(d)(3)).

30. Historically, Medicare payments for outpatient services and procedures could differ depending on the site of service. Hospital-based procedures performed in hospital outpatient departments were paid under the Outpatient Prospective Payment System (OPPS), while freestanding clinics were paid under the Medicare Physician Fee Schedule (MPFS). Payments under the OPPS are typically higher than the MPFS counterpart.

7

31.  Regarding laboratory service billing, 42 U.S.C. 13951(l)(h)(5)(A) provides that payment for a clinical diagnostic laboratory "may only be made by the person or entity which performed or supervised the performance of such test[.]"

32. However, 42 U.S.C. 13951l(h)(5)(A)(ii) provides three (3) exceptions to this rule when a test is performed at the request of a laboratory by another laboratory: payment may be made to the referring laboratory only if (1) the referring laboratory is located in a rural hospital; (2) the referring laboratory is wholly owned by the entity performing the test, wholly owns the entity performing the test, or both the referring laboratory and the entity performing the test are wholly-owned by a third entity; or (3) no more than 30 percent of the referring laboratory's clinical diagnostic laboratory tests are performed by another laboratory.

## FACTUAL BACKGROUND

### *Foundation's Agreement with Desert Imaging*

33. Relator began working as the Chief Financial Officer for Foundation on August 14, 2017. During the course and scope of her employment, Relator came to learn of a relationship that existed between Foundation and Desert Imaging in which state and Federal healthcare programs were billed for certain medical imaging services from January of 2017 to June of 2017.

34. On August 12, 2016, Foundation and Desert Imaging entered into a Management Services Agreement (the "Desert Agreement") in which Desert Imaging was to "provide development services to assist [Foundation] in the establishment of outpatient imaging Centers . . . ." *See* Exhibit A, Section 2.1.  These centers were to be located at five (5) different locations in El Paso.  *Id.*  By virtue of the Desert Agreement, Foundation was using Desert Imaging's services in an attempt to establish hospital outpatient departments that qualified for "provider-

based" status, so that Foundation could bill Federal healthcare payers at a higher reimbursement rate than Desert Imaging otherwise could have billed, and reap a significant profit.

35. Per the Desert Agreement, Desert Imaging was to "provide management, equipment, physician supervision, and supplies . . . as reasonably necessary for the performance of the technical imaging services at the Centers" to patients of Foundation. *Id.* The Desert Agreement specifically stated that "[t]he Centers are intended to be, and shall be, part of [Foundation], subject to [Foundation's] oversight and authority, and not a separate legal entity." *Id.*

36. The Desert Agreement further provided that Desert Imaging "will also work cooperatively with other [Foundation] departments and staff to provide for the effective and efficient management of the Centers," and that "[t]he parties acknowledge and agree that [Foundation] shall be identified as the provider of the Imaging Services." *Id.* Foundation was to be "solely responsible for certain billing and administrative services to facilitate the provision of the Imaging Services to patients of [Foundation]." *Id.*

37. Under the Desert Agreement, the services provided at the centers were to be "performed under the supervision of a physician who is a member in good standing of the Medical Staff of [Foundation] and credentialed by [Foundation] to perform the Imaging Services." *See* Exhibit A, Section 2.4. Desert Imaging was also to "make certain that all clinical documentation, reports, and medical records resulting from the Imaging Services (the "Records") shall be prepared by the appropriate health care provider, but shall be owned by [Foundation] . . . ." *Id.* at Section 2.6.

38. Section 2.7 (sic) of the Desert Agreement provided that Foundation was to "monitor and oversee the Imaging Services in the same manner as it does for services provided in any department of the Hospital to the extent required by statutory, regulatory, or accreditation

standards" and that patients of the centers "shall be registered and admitted as outpatients of [Foundation] for diagnosis and treatment by Centers in accordance with [Foundation's] registration and admission policies." *Id.* at Section 2.7, 2.8.1. Foundation was also to "employ or engage all non-physician technical personnel required to perform the Imaging Services" and "ensure that its non-physician technical personnel assigned to provide the Imaging Services have appropriate certifications or licenses necessary to lawfully perform the Services . . . ." *Id.* at Section 2.8.4.

39. The Desert Agreement also required Foundation to retain In Tandem to provide billing services related to the contract. *Id.* at Section 3.5. In Tandem was paid 5% of collections for these billing services. *Id.* A separate contract was entered into between Foundation and In Tandem. Upon information and belief, In Tandem is owned by the same individuals who own Desert Imaging.

40. Additionally, in a separate agreement, Foundation agreed to pay Desert Imaging a monthly fee of $45,118.53 to lease some of Desert Imaging's equipment. *See* Exhibit B, p.7. However, this equipment was never actually leased, and, as evidenced by Foundation's financial documents, Foundation never made a lease payment. *See* Exhibit C.

41. As compensation for this arrangement, Desert Imaging was entitled to 70% of fees collected for the services provided at the centers, less payer or patient refunds, plus 8% of fees collected for billing for services provided at the centers, less Foundation's direct costs of employing clinical personnel. *See* Exhibit A, Section 3.1. The Desert Agreement also provided that Foundation "shall have the exclusive right to bill [Foundation] patients and applicable third party payers under [Foundation's] provider numbers, and collected for the Services provided

10

under this Agreement." *Id.* at Section 3.3. This section also stated that "[a]ll collections shall belong solely to [Foundation], and [Desert Imaging] disclaims any interest therein." *Id.*

42. Importantly, under the terms of the Desert Agreement, each party "represent[ed] and warrant[ed] that it is not now and at no time has been excluded from participation in any federally funded healthcare program, including Medicare and Medicaid." *Id.* at Section 8. As the ability to bill these programs was critical to the deal's profitability, each party "agree[d] to immediately notify the other of any threatened, proposed, or actual exclusion from any federally funded health care program . . . ." *Id.* A party's exclusion from those programs amounted to a breach of the Agreement, and resulted in the Agreement's automatic termination. *Id.*

*The Imaging Scheme*

43. Foundation's and Desert Imaging's actions did not comport with the Desert Agreement's seemingly legal nature. Beginning in January 2017 and continuing through June 2017, Foundation billed Federal and state healthcare payers, including Medicare, Medicaid, Tricare, and Workers' Compensation, for services provided at the "outpatient" centers. *See* Exhibit D. However, during this time, the outpatient centers did not satisfy the "provider-based" requirements of 42 C.F.R. 413.65 that would entitle Foundation to bill Federal healthcare payers at an increased cost.

44. Four of the five locations of the outpatient centers identified in the Desert Agreement were imaging facilities owned and operated by Desert Imaging prior to the execution of the Agreement. At no time during the operation of the Desert Agreement did Foundation maintain any sort of ownership interest in these four locations. These facilities are still owned or leased and operated by Desert Imaging today. The 643 South Mesa Hills Dr. location is the only

11

location that housed a Foundation outpatient facility; however, it was never operated by Desert Imaging.

45. From January 2017 to June 2017, Desert Imaging began billing Federal and state healthcare payers under Foundation's provider number for the services it performed on patients at its centers. These patients were not referred to Desert Imaging by Foundation. Referrals to Desert Imaging centers were made by community physicians. Thus, Foundation billed Federal and state healthcare payers for services provided to patients who otherwise had no connection to Foundation.

46. The "outpatient" centers were owned and operated by Desert Imaging prior to the execution of the Desert Agreement. However, once the Desert Agreement was executed, Desert Imaging employees were rebadged to become Foundation employees in order to present the illusion that such employees were hospital employees. As soon as the Desert Agreement fell through in June 2017 for an unknown reason, however, these employees were rebadged back to Desert Imaging as employees. As explained below, the rebadging of employees from Desert Imaging to Foundation was the extent of Foundation's control over Desert Imaging's business operation as a hospital outpatient department.

47. At the centers, Desert Imaging acted completely on its own without any oversight or supervision from Foundation. Upon information and belief, Desert Imaging failed to comply with hospital outpatient department regulations in the following ways:

    i.    The centers did not implement any of Foundation's hospital policies and procedures. Upon information and belief, Foundation's Compliance Officer, Carmen Correa, was unsuccessful in implementing any Foundation policies and procedures at Desert Imaging centers.

ii.   Desert Imaging's professional staff did not have any clinical privileges at Foundation.

iii.  There was no reporting relationship between Foundation's chief medical officer and any directors of the centers.

iv.   Foundation did not implement or oversee quality assurance or utilization review of the centers.  Upon information and belief, Correa attempted to implement quality and utilization controls but was unsuccessful.

v.    At no time did the centers and Foundation share a unified retrieval system for medical records.

vi.   The centers' outpatient services were not integrated with Foundation's inpatient services such that patients of the centers had access to Foundation's services.  All patients were referred to the centers by outside physicians with no intent of accessing Foundation's inpatient services.

vii.  Foundation and Desert Imaging did not integrate their financial operations.

viii. Desert Imaging and Foundation did not make any public announcements or take sufficient steps to advise the public as to Foundation's relationship with the centers.

ix.   Foundation did not have responsibility for hiring and firing decisions.

x.    The centers did not operate under the same organization documents as Foundation.

xi.   Perhaps most jarringly, Foundation did not have, and has never had an ownership interest in or control over the centers.

48. The independence that Desert Imaging had in operating the centers is astounding. To this day, Foundation does not even possess records for numerous patients treated at the centers, including physician orders, consent forms, insurance information, photo IDs, test results, and invoices. Many of the records, reports, and test results that Foundation does have for services provided at the centers are emblazoned with the Desert Imaging name without any reference to Foundation.

49. While Desert Imaging's consent forms maintained they were "an outpatient department of Foundation Surgical Hospitals," they directed patients with grievances against the centers to contact Desert Imaging's CEO at a number operated by Desert Imaging.

50. The centers operated by Desert Imaging maintained a separate records system. Rather than create an interface to fully integrate Foundation and Desert Imaging records' systems, Foundation had to hire 2-3 employees to register and scan Desert Imaging records into Foundation's system. The records were often incomplete.

51. Foundation's billing system was likewise separate from Desert Imaging's billing system. Foundation utilized a program called Healthland, while Desert Imaging utilized a program called Abbadox. Foundation often received payment from a patient's insurer, but no account for that patient had been established on its system. Foundation employees would then have to create an account retroactively. Foundation would obtain the payment amounts from the explanation of benefits ("EOBs") it received. A chargemaster rate would be generated in Healthland. However, Foundations' chargemaster rate was often lower than the charge listed by Desert Imaging in the EOBs. Because of this, Foundation was often forced to include a negative adjustment in its records in order to match its charges with the amounts paid by patients of

Desert Imaging. Because of this, much of Foundation's accounting records with respect to the centers cannot be reconciled with Desert Imaging's amounts charged.

52. Foundation tasked several employees with the sole responsibility of registering patients from Desert Imaging's centers into Foundation's systems. Desert Imaging registered as many as 300 to 400 patients per day. Foundation could not keep pace with the amount of patients Desert Imaging registered, as it would take approximately fifteen (15) minutes to register a new patient into Foundation's system. Foundation employees would register, at most, approximately 150 patients a day into Foundation's system. By June 2017, Foundation acquired a total of over 18,000 accounts from Desert Imaging. After Foundation's relationship with Desert Imaging ended, it took Foundation employees months to finishing adding all of the patients acquired from Desert Imaging into Foundation's system.

53. Foundation carried some costs related to Desert Imaging on its income statement. Specifically, Foundation carried the management fees paid to Desert Imaging and the salaries for rebadged employees. However, all other costs associated with Desert Imaging's operation were carried on Desert Imaging's books.

54. Moreover, Desert Imaging also operated a mobile mammography unit in the Midland/Odessa, Texas area. This unit also billed Federal and state healthcare payers under Foundation's provider numbers, despite the fact that this mobile unit was not even contemplated as an outpatient center under the Desert Agreement.

55. Once Desert Imaging rendered services for these patients, Desert Imaging would bill the appropriate Federal or state healthcare payer using Foundation's provider numbers. Once payment was received, Foundation would then pay Desert Imaging. During the six-month period in which the parties colluded to defraud Federal and state healthcare payers, Foundation billed

these payers on 9,725 accounts and collected $1,190,059.06 pursuant to work done by Desert Imaging's centers.

56. While In Tandem purported to send all money billed and collected to Foundation, over $400,000 was kept by Desert Imaging. *See* Exhibit C.

57. Once the agreement between Foundation and Desert Imaging came to an end, Desert Imaging dropped Foundation as a cohort and took its employees with it. The patients that Desert Imaging performed services on likewise left with Desert Imaging, as these patients had no connection with Foundation whatsoever.

58. It is clear that the Desert Agreement between Desert Imaging and Foundation was a complete subterfuge designed to take advantage of the higher reimbursement rates under 42 C.F.R. 413.65. The centers operated by Desert Imaging in no way meet the requirements to qualify for "provider-based" status and, thus, enable Foundation to profit off of the higher costs for which it would be entitled to bill Federal and state payers.

***The Toxicology Scheme***

59. The compensation of Foundation's Chief Executive Officer, Don Burris, was and is directly tied to the amount of revenue obtained by Foundation. *See* Exhibit E. Burris received 1% of Foundation's collections. *Id.* Notably, Burris was hired through a Management Services Agreement entered into between Vox Intus, of which Burris is the president, and Foundation on April 1, 2017. *See Id.* Vox Intus and Foundation had also previously entered into a Management Services Subcontract Agreement on October 1, 2015 by which Vox Intus was to "administer, direct, and coordinate activities in accordance with the objectives and strategies required by the hospital . . . ." *See* Exhibit F.

16

60. As the agreement with Desert Imaging came to a halt, Foundation sought alternate means to generate revenue.   On or about July 19, 2017, Foundation and Principle executed a Management Services Agreement (the "Principle Agreement").  *See* Exhibit G.  The Principle Agreement noted that Foundation owned a toxicology, blood and genetics laboratory at 1810 Murchison, Suite 230, El Paso, Texas.   *Id.*at p.1.  Foundation sought to engage Principle to "provide its skills and supervision to develop and manage the Laboratory . . . ." *Id.*  As indicated in Section 1(a) of the Principle Agreement, Foundation retained Principle to "develop and manage the Laboratory as a hospital *outpatient* department of [Foundation] . . . ." *Id.* (emphasis added).  The parties intended that the Laboratory be operated as a *provider-based* department of the hospital.  *Id.* at 1(e)(xi).

61. In exchange for "management" services, Foundation agreed to pay Principle 70% of the collected revenue just as it did in the Desert Agreement.  The Principle Agreement specifically stated that "[Principle] and hospital agree not to utilize the laboratory for tests reimbursed by Federal health care programs, including the Medicare and Medicaid programs.  [Principle] shall take reasonable steps to ensure that the hospital does not bill any Federal healthcare programs for services provided by the laboratory.  *Id.* at 6(a).

62. Thus, similar to its engagement with Desert Imaging, Foundation contracted with a third-party (Principle) to develop an outpatient department of the hospital.  Foundation and Principle intended that the Laboratory would have provider-based status, and consequently be able to bill for laboratory services at a rate higher than non-hospital laboratory service providers.

63. However, despite contracting with Principle to run the hospital's "Laboratory," Foundation's "Laboratory" lacked the necessary equipment to perform the vast majority of laboratory services.

17

64. Instead of obtaining costly equipment to perform services at the outpatient department it purported to create with Principle, Foundation instead entered into two additional agreements with laboratory service providers, AIT and Concord.

65. On or around July 19, 2017, Foundation entered into a Referral Testing Agreement with Concord (the "Concord Agreement"). *See* Exhibit H. Concord agreed to provide blood testing services for Foundation. *Id.* In exchange, Foundation would pay Concord "50% of the current CMS reimbursement rates per CPT code." *Id.* at Exhibit A.

66. On or around July 20, 2017, Foundation entered into a Hospital Laboratory Reference Agreement with AIT (the "AIT Agreement"). *See* Exhibit I. AIT agreed to provide toxicology lab testing services for Foundation in exchange for a payment of $75 per specimen and an additional $65 per specimen after the claim was adjudicated. *Id.* at Exhibit A.

67. A third laboratory, NCF, provided testing services related to DNA samples obtained by Principle. Payers were billed for these services by Principle under Foundation's provider number. Unlike with Concord and AIT, no referral agreement authorizing NCF to bill payers under Foundation's provider number was ever formalized in writing.

68. Despite the Principle Agreement, which clearly indicated no Federal healthcare payers would be billed for Laboratory services, the AIT Agreement required representation from both parties that "neither that party nor any entity owning or controlling that party is excluded from any Federal health care program including the Medicare/Medicaid program or from any state healthcare program." *Id.* at Section 5.3.

69. Upon information and belief, the vast majority of samples provided for testing pursuant to the Principle Agreement did not come from Foundation's own patients. Rather, Principle procured all testing samples from its network of outside referral sources.

70. Upon information and belief, toxicology samples procured by Principle were shipped to Foundation from medical facilities in Texas, Oklahoma and Louisiana. Foundation's only responsibility with regard to toxicology samples was to repackage them and ship them to AIT. AIT performed the required testing on the samples and billed Foundation for its services. Principle employees, in turn, billed each patient's insurer through Foundation's Healthland system, including state and Federal healthcare payers.

71. Principle was responsible for registering the patients, entering charges into Foundation's Healthland system, and coding and releasing all claims. Principle was also responsible for all collection efforts for samples from AIT, Concord, and NCF.

72. Upon information and belief, blood samples procured by Principle were not shipped to Foundation. Instead, Principle shipped the blood samples directly to Concord. Concord performed the required testing on the samples. Principle would then bill each patient's insurer, including state and Federal healthcare payers using Foundation's provider number.

73. Upon information and belief, Principle also procured, repackaged, and shipped DNA samples to a company in Florida, believed to be NCF, and billed insurers for testing services under Foundation's provider number.

74. The Principle Agreement purported to establish an outpatient laboratory at 1810 Murchison. However, the actual location of this outpatient laboratory was 1400 George Dieter. The only testing performed at that location was testing of respiratory samples. Upon information and belief, respiratory testing samples made up just 1-2% of the samples procured by Principle.

75. For unknown reasons, Burris ended the Principle Agreement on or about April, 2018.

76. Foundation's arrangement with third party laboratory service providers violates Medicare billing rules concerning Reference Labs. Although the agreements between the parties purport to

establish a legal hospital outpatient department with a reference lab arrangement, the arrangement between Principle, Foundation, AIT and Concord is nothing more than impermissible pass-through billing. Upon information and belief, Foundation does not perform at least 70% of its own lab testing, yet it bills Federal healthcare payers as though it does. Federal healthcare payers have paid Foundation for tests Foundation did not perform, and at a higher contracted rate than payers would have paid had the performing independent laboratory billed the payer directly.

77. Between July 24, 2017 and April 30, 2018, Foundation billed insurers more than $17,000,000.00 for 11,479 claims related to lab services provided under the Principle Agreement. Although the great majority of the claims were processed by commercial insurers, including Blue Cross Blue Shield, claims were also submitted to Medicare, Medicaid, Tricare, and Blue Cross Blue Shield Federal Employee Plan.

78. Foundation's pass-through billing scheme has caused substantial confusion for patients. Recently, Foundation's third-party statement processor, DivDat, sent invoices to patients on behalf of Foundation in an attempt to collect the outstanding patient liabilities for testing services provided through the Principle Agreement. Patients, rightfully confused as to how they could owe a payment to a hospital they have not visited, have alerted insurers and credit reporting agencies of possible identity theft and fraud. Exhibit J.

79. Burris instructed staff to cease invoicing patients for patient liabilities and to write-off outstanding charges.

80. Patient lab consent forms from Principle display inconsistent, mismatched patient signatures when compared across multiple forms and to the patient's driver's license signature, suggesting someone other than the patient signed the consent forms.

81. When Relator discovered the true nature of the referral arrangements, Relator informed Burris that this was impermissible pass-through billing. Burris, however, responded to Relator that there was no issue with this arrangement, and to never use the term "pass-through billing" again. Upon information and belief, Burris also told Carmen Correa and Carmen Campos to "back off" when they confronted him about the pass-through billing schemes.

82. When patients began inundating the hospital with calls regarding laboratory billing and claims of fraud, Correa attempted to report the calls and allegations to the Medical Executive Committee. However, Burris did not allow Correa to raise the issue.

83. In times since, Relator has continuously brought up various concerns regarding impermissible and fraudulent billing that Foundation has engaged in towards both Federal, state and private payers. Burris, however, has consistently ignored Relator's concerns.

84. Upon information and belief, Defendant Foundation recently entered into a toxicology management contract with Texas Healthcare Partners.

85. Further, upon information and belief, it is believed that Burris is attempting to sell Foundation and has obtained appraisals. Exhibit K.

## COUNTS AGAINST DEFENDANTS

## COUNT I

## False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)

86. Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

87. Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States government, including those claims for

reimbursement for medical services performed at facilities which did not meet the regulatory requirements for hospital outpatient diagnostic facilities or reference laboratories.

88. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

89. By virtue of the false or fraudulent claims made by Defendants, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $11,181.00 to $22,363.00 for each violation.

## COUNT II

### Anti-Kickback Statute, 42 U.S.C § 1320a-7b

90. Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

91. Defendants have violated the Anti-Kickback Statute by implementing what is essentially a pass-through billing program. Foundation's split of revenue with Defendants Desert Imaging and Principle is an inducement in exchange for the receipt of a referral from those Defendants. Foundation paid the Defendants for referring the specimen or imaging patient so that Foundation could bill government healthcare payers for work Foundation did not perform.

92. Each claim for reimbursement for Foundation's "services" represents a false claim because each claim carried with it a false certification by Foundation that the service it provided complied with the Anti-Kickback Statute.

## COUNT III

### Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.*

93. Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth herein.

94. Tex. Hum. Res. Code § 36.002, in part, provides for liability for any person who:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; …

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

> (A) is not licensed to provide the product or render the service, if a license is required; or
> (B) is not licensed in the manner claim; …

(8) makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service….

95. Defendants violated Tex. Hum. Res. Code § 36.002 and knowingly caused false claims to be made, used, and presented to the State of Texas, including those claims for reimbursement for medical services performed at facilities which did not meet the regulatory requirements for hospital outpatient diagnostic facilities or reference laboratories.

## PRAYER FOR RELIEF

96. WHEREFORE, Relator prays that judgment be entered against Defendants, ordering that:

   i.    The Defendants cease and desist from violating the Federal False Claims Acts;

   ii.   The Defendants cease and desist from violating Tex. Hum. Res. Code §§ 36.001 *et seq.*

   iii.  As to Counts I and II, Relator respectfully requests this Court award:

a. A civil penalty of not less than $11,181.00 and not more than $22,363.00 for each violation of 31 U.S.C. § 3729 *et seq.*, plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

b. The maximum Relator's share allowed pursuant to 31 U.S.C. § 3730(d); and

c. All costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. 3730(d).

iv.  As to Count III, Relator respectfully requests this Court award:

a. A civil penalty of not less than $5,500.00 and not more than $11,000.00 for each violation of Tex. Hum. Res. Code §§ 36.001 *et seq.,* plus three times the amount of damages the State of Texas has sustained because of Defendants' misconduct;

b. A fair and reasonable Relator's share allowed pursuant to Tex. Hum. Res. Code § 36.119 *et seq.*;

c. Reimbursement of reasonable expenses which Relator incurred in connection with this action;

d. Attorneys' fees and costs.

v.  Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the damages, penalties, fines, and costs awarded by the Court;

vi.  The United States, State of Texas and Relator be awarded such other relief as the Court deems just and proper.

24

## JURY TRIAL

97.  Pursuant to Rule 38 of the Fed. R. Civ. P., Relator demands a trial by jury.

Respectfully submitted,


/s/ Steve Sumner_____
Steve Sumner
Texas Bar No. 19508500
E-Mail: ssumner@sumnerschick.com

Sumner Schick
3811 Turtle Creek Blvd.
Suite 600
Dallas, Texas 75219
T:(214) 965-9229
F:(214) 965-9215

ATTORNEY FOR RELATOR

```
Court Name: TEXAS WESTERN
Division: 3
Receipt Number: 300032810
Cashier ID: sflores
Transaction Date: 11/14/2018
Payer Name: SUMNER LEGAL SERVICE PC
----------------------------------
CIVIL FILING FEE
 For: SUMNER LEGAL SERVICE PC
 Amount:        $400.00
----------------------------------
PAPER CHECK
 Check/Money Order Num: 9250
 Amt Tendered:  $400.00
----------------------------------
Total Due:       $400.00
Total Tendered: $400.00
Change Amt:       $0.00

CIVIL FILING FEE

3:18-CV-348-FM

USA VS EAST EP PHYSICIAN'S MEDICAL
CTR, LLC, ET AL..
```